William Harry SIMPSON, Petitioner,

v.

James MATESANZ, Respondent.

Civil Action No. 97–11017–NG.

United States District Court,
D. Massachusetts.

Nov. 12, 1998.

12

William Harry Simpson, Norfolk, VA, pro se.

Pamela L. Hunt, Attorney General's Office, Criminal Bureau, William J Duensing, Assistant Attorney General, Boston, MA, for Respondent.

## *ORDER*

GERTNER, District Judge.

For the reasons set forth in the accompanying Memorandum and Order, the Petitioner's Motion for Habeas Corpus [docket # 1] is **GRANTED.**

**SO ORDERED.**

### *MEMORANDUM AND ORDER*

This is a case in which every single attempt to define reasonable doubt in the jury instructions was, by current constitutional standards, problematic, and in which the instructions as a whole were very likely to have conveyed to the jury an unconstitutional conception of the government's burden of proof. If we are to mean it when we say that such errors are fundamentally at odds with a fair trial, then we must apply current norms retroactively and unflinchingly. No matter how heinous the crime, or how daunting the prospect of staging a new trial, a proper conviction was never rendered, and a new trial must be ordered.

Petitioner William Harry Simpson ("Simpson"), here challenges the reasonable doubt instructions given at his 1974 state trial for first degree murder, armed robbery,

and breaking and entering. Because the errors in the instructions are so profound, and are so central to the fairness of his trial, Simpson's petition for a writ of habeas corpus is **GRANTED.**

## I. BACKGROUND

On October 31, 1974, Simpson was convicted in Worcester Superior Court of first degree murder, armed robbery, and breaking and entering. He was sentenced to life without parole. Simpson filed a timely notice of appeal. Then, on March 21, 1975, Simpson filed a motion for a new trial. The new trial motion was denied one week later, and Simpson appealed that denial as well. The Massachusetts Supreme Judicial Court ("SJC") heard the appeal of both the conviction and the denial of the new trial motion under the authority of M.G.L. c. 278, §§ 33A–33G. Simpson did not challenge the jury instructions in either appeal. The SJC affirmed the conviction and denial of the motion for a new trial on April 9, 1976. *Commonwealth v. Simpson,* 370 Mass. 119, 120, 345 N.E.2d 899 (1976).

Simpson moved for a new trial five more times. The first time he complained that the reasonable doubt instruction was in error, however, apart from his objection at trial,[1] was in his third new trial motion, made on April 25, 1988. That motion was denied on September 19, 1988. He raised the issue again in his fourth motion for a new trial, made on November 3, 1988. When that motion too was denied he sought leave to appeal from a single justice of the SJC, as required by M.G.L. c. 278, § 33E. On October 15, 1990, Justice Greaney denied his motion for leave to appeal, claiming that he was "persuaded by the arguments in the Commonwealth's opposition memorandum that the defendant has not demonstrated that any of the issues which he now seeks to raise are new or substantial." *Commonwealth v. Simpson,* SJC for Suffolk County No. 90–274.

After Justice Greaney denied him leave to appeal, Simpson again moved for a new trial, again claiming jury instruction errors, in 1992 and in 1994. Both motions were denied. He moved for reconsideration of the denial of the sixth motion twice. Leave to appeal was again denied, for the final time, by a single justice of the SJC on October 30, 1997.

This is Simpson's first habeas petition before this Court. He argues that he has exhausted his state remedies, and that this Court should consider his challenge to the reasonable doubt instructions given to the jury at his trial. The judge's instructions on reasonable doubt, which Simpson contests, read as follows (with the sentences numbered, and phrases that are the subject of this challenge underlined and lettered):

[1] Now, the words "beyond a reasonable doubt" are a legal shorthand expression that stand for the degree of certainty that is required before a jury may convict a person, any person, of a crime, any crime. [2] It means that after weighing the testimony, evaluating whether you are going to believe any, part, all or none of any witness' story, after examining the exhibits, after hearing the whole case, the evidence that you have heard discussed amongst yourselves, you must, all 12 of you, [a] *be sure* that he is guilty. [3] Otherwise, he is entitled to the benefit of the doubt and must be acquitted.

[4] Now, when I say sure, I don't mean that the commonwealth has to prove a defendant's guilt to an absolute or mathematical certainty. [5] That is not what we mean by beyond a reasonable doubt .[6] But what we mean rather is that when all is said and done in your jury room, after you have gone over the testimony, the exhibits, after you have taken into consideration .the law as I explain it to you, [b] *you must be sure to a moral certainty,* [c] *to that same degree of certainty which you would want when you have had to make decisions of importance in your own lives.* [7] After you have discussed the evidence thoroughly amongst yourselves, [d] *if you*

---

1. When the trial judge finished his instructions, Simpson's attorney asked him to clarify the concept of reasonable doubt so that jurors sitting in a venire treating civil and criminal cases would be clear on the difference between a "preponderance of the evidence" and "reasonable doubt." The judge refused.

*have any serious unanswered questions* about the defendant's guilt, then he must be given the benefit of the doubt.

## II. DISCUSSION

### A. Independent and Adequate State Grounds

██ Out of consideration for comity and federalism, a federal court will not engage in habeas review when the petitioner is being held pursuant to a state court judgment that is based on an independent and adequate state-law ground. *Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Wainwright v. Sykes,* 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A petitioner's procedural default in state court is a "typical" example of an independent and adequate ground that bars federal habeas review. *See Trest v. Cain,* 522 U.S. 87, 118 S.Ct. 478, 480, 139 L.Ed.2d 444 (1997).

#### 1. Waiver

██ Simpson argues that the Commonwealth has waived its procedural default argument by failing to raise it in its initial motion to dismiss in this case, filed on October 8, 1997. Simpson correctly points out that the petitioner's procedural default is an affirmative defense that the state normally must raise or lose. *See Gray v. Netherland,* 518 U.S. 152, 165–66, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). But the Commonwealth cannot be said to have waived its procedural default defense by focusing exclusively on Simpson's failure to exhaust state remedies since such a focus was obviously warranted at the time.

██ In footnote one in its initial motion before this Court, the Commonwealth said: "Since it is clear from the face of the petition that the petitioner has failed to exhaust available state remedies, the Superintendent and the Commissioner will not, in the interest of economy, address any additional defenses."

Federal courts generally are barred from granting writs of habeas corpus to persons in custody pursuant to the judgment of state courts unless the petitioner has exhausted all remedies available in state courts. *See* Antiterrorism and Effective Death Penalty Act ("AEDPA") (1996), 28 U.S.C. § 2254(b)(1)(A).[2] *See also Harris v. Reed,* 489 U.S. 255, 268–69, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989).

The Commonwealth's focus on the exhaustion issue was entirely appropriate. When Simpson filed his habeas motion, in April 1997, his application for leave to appeal the denial of his second motion for reconsideration (of the denial of his sixth motion for a new trial) was still pending. It was not denied by a single justice of the SJC until October 30, 1997, almost three weeks after the Commonwealth filed its initial motion to dismiss on exhaustion grounds. Had Simpson's final state court motion not been denied, thereby effecting the exhaustion of Simpson's state remedies, I would have been constrained to allow the Commonwealth's motion to dismiss. The Commonwealth's choice to focus only on the non-exhaustion issue was a perfectly reasonable attempt to deal with an obvious threshold issue. Since it has not prejudiced Simpson in any way, I will not penalize the Commonwealth for it.

#### 2. Procedural Default

##### a. Failure to Pass the Gatekeeper

██ The Commonwealth argues that Simpson procedurally defaulted because he failed, on three separate occasions, to demonstrate to a "gatekeeper" justice of the SJC that his claims were "new" and "substantial." *See Leaster v. Commonwealth* 385 Mass. 547, 432 N.E.2d 708 (1982) (first describing the single justice's power, under M.G.L. c. 278 § 33E, to grant or deny leave to appeal capital cases after the first appeal as a "gatekeeper" function). *See also* M.G.L. c. 278 § 33E, which reads in relevant part as fol-

---

**2.** § 2254(b)(1): An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that—

    (A) the applicant has exhausted the remedies available in the courts of the state;

or
    (B)(i) there is an absence of available state corrective process; or
    (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

lows: "If any motion [in a capital case] is filed in the superior court after rescript [by the SJC], no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the [SJC] on the ground that it presents a new and substantial question which ought to be determined by the full court."

The Commonwealth correctly points out that the gatekeeper's role is to "screen out appeals that lack merit," *Commonwealth v. Francis*, 411 Mass. 579, 584, 583 N.E.2d 849 (1992), and that within the state system, the gatekeeper's denial of a defendant's petition for leave to appeal to the SJC is final and unreviewable, *Commonwealth v. Ambers*, 397 Mass. 705, 710–11, 493 N.E.2d 837 (1986) (citing *Leaster*). Nevertheless, it wrongly infers that the gatekeeper's denial of leave to appeal always amounts to a procedural default for habeas purposes.

The Commonwealth cites my opinion in *Andrews v. Matesanz* to support the proposition that a gatekeeper's denial of leave to appeal can be a "clear independent and adequate state ground for denying the petitioner's motion for a new trial." U.S.D.C. No. 96–11859–NG, slip op. at 9 (May 1, 1997) (internal quotations omitted). However, I never suggested that it was the fact that the gatekeeper did not deem the claims "new" and "substantial," in and of itself, that constituted a procedural default. Rather, it was the reason why the petitioner's claims were not "new and substantial" that mattered. In *Andrews*, I found that the petitioner procedurally defaulted because the claims he sought to raise on a § 33E appeal were available at the time of his initial appeal and he failed to raise them. Failure to appear meritorious to a gatekeeper cannot plausibly be put on a par with failure to take certain standard steps, such as preserving issues by raising them on appeal.

Indeed, no court has ever held that failure to be granted leave to appeal was, by itself, a procedural default. Rather, the case that has come closest to dealing with this question head-on, *Little v. Murphy*, 1998 WL 704415 (D.Mass.1998), held, as I do, that procedural default might be the ground for a gatekeeper's denial of leave to appeal, but it cannot be inferred from the mere fact of the gatekeeper's negative decision.

In *Little* the petitioner argued that the Commonwealth of Massachusetts had a constitutional obligation to give him a new trial based upon new evidence which suggested that someone else committed the murder for which he was convicted. The respondent claimed that the petitioner defaulted because a single Justice of the SJC had denied the petitioner's motion for leave to appeal on the grounds that the petitioner did not raise the issue in his brief on direct appeal. *Id.*, 1998 WL 704415, at *2. But the District Court disagreed: since the gatekeeper Justice gave no reason for denying the petitioner leave to appeal, the District Court would not read a procedural bar into the gatekeeper's negative decision. *Id.* Citing to *Harris v. Reed*, 489 U.S. at 263, 109 S.Ct. 1038, the Court noted that a procedural default in state court would bar consideration of a habeas petition only if "the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." The implication of *Little*'s reasoning is that failure to get past the gatekeeper does not by itself block federal habeas review unless the single Justice clearly bases his denial of leave to appeal on a procedural bar. *See also Dickerson v. Latessa*, 872 F.2d 1116, 1120 (1st Cir.1989) (describing the gatekeeper's function as relieving the SJC of the "burden of subsequently entertaining waived or frivolous claims;" implying thereby that waiver is something a gatekeeper *may* find, not something created simply by the failure to convince the gatekeeper of the validity of one's claims).

### b. Contemporaneous Objection Rule

█ If there were to be any ground for the claim that Simpson procedurally defaulted on his new trial claim, it would have to be that he did not raise the jury instruction issue when he first appealed his conviction. *See Hall v. DiPaolo*, 986 F.2d 7, 11 (1st Cir.1993) ("Under Massachusetts law, a criminal defendant may file a motion for post-conviction relief at any time, however any grounds not raised in a defendant's first such motion are waived unless ... the defendant shows that the new ground raised in a suc-

cessive post-conviction motion could not have been raised in his first motion;" citing Mass. R.Crim. P. 30). But there are two reasons that charge cannot stick.

### i. An Exception to the Rule

First, as I said in *Moore v. Ponte*, 924 F.Supp. 1281, 1297 (D.Mass.1996), the SJC has chosen "not to apply the contemporaneous objection rule" when the challenge concerns reasonable doubt instructions. The SJC's reason was that if "the instruction on reasonable doubt given at [the defendant's] trial was constitutionally deficient in that it permitted the jury to convict the defendant on proof less than proof beyond a reasonable doubt, a substantial miscarriage of justice very likely would result." *Commonwealth v. Gagliardi*, 418 Mass. 562, 568, 638 N.E.2d 20 (1994) (creating an exception to the "waiver rule" (i.e. the contemporaneous objection rule) as articulated in *Commonwealth v. Watson*, 409 Mass. 110, 112, 565 N.E.2d 408 (1991)).

The First Circuit has made a point of saying "that review by the [SJC] under a 'miscarriage of justice' standard does not *automatically* waive the state's 'contemporaneous objection' rule," where the SJC has conducted its review only on state, not federal grounds. *McCown v. Callahan*, 726 F.2d 1, 3 (1st Cir.1984) (emphasis added). *See also Tart v. Commonwealth of Massachusetts*, 949 F.2d 490, 496 (1st Cir.1991) (citing *McCown* ). But the SJC in *Gagliardi*, which followed *McCown* and *Tart*, may well have changed the landscape when it comes to reasonable doubt instructions. In *Gagliardi*, the Court did more than merely look for a miscarriage of justice; it explicitly waived the contemporaneous objection rule as applied to constitutionally deficient reasonable doubt instructions. 418 Mass. at 568, 638 N.E.2d 20. Moreover, it did so because of

the strength of the evolving federal precedent (citing to both *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), and *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994)).[3]

The First Circuit has yet to examine the implications of *Gagliardi*, but I find that the SJC's explicit exemption of challenges to reasonable doubt instructions from the contemporaneous objection rule, based on changes in both state and federal constitutional law, constitutes "a clear showing that the state waived its procedural objection," as required by *McCown*, 726 F.2d at 4.[4]

### ii. New Law, Retroactively Applied

It also would not have been possible for Simpson to raise the reasonable doubt objections he now raises on his first appeal and motion for a new trial in 1976, because the law on reasonable doubt instructions had yet to undergo the significant changes that are pivotal for his case. It was not until the next year, 1977, that the SJC first criticized the "important decisions" language in jury instructions on reasonable doubt. *See Commonwealth v. Ferreira*, 373 Mass. 116, 128–29, 364 N.E.2d 1264 (1977) ("important decisions" language could be reversible error if "bereft of [other] saving graces").[5] And it was not until 1990 that the "moral certainty" language in Simpson's reasonable doubt instruction became a source of reversible error on the federal level. *See Cage v. Louisiana*, 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), criticized on other grounds in *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Moreover, the First Circuit has followed at least three other circuits in holding that *Cage* "announced a new rule of constitutional law." *See Rodriguez v. Superintendent, Bay State Correctional Center*, 139 F.3d 270, 273–74 (1st Cir. 1998). *See also Adams v. Aiken*, 41 F.3d

---

3. The way Massachusetts is tracking federal law on reasonable doubt instructions is discussed in more detail at the end of the next subsection, II.A.2.b.ii.

4. Simpson points me to four recent Massachusetts cases that all cite *Gagliardi* for the proposition that the "waiver rule" is not applied to challenges to reasonable doubt instruction: *Commonwealth v. Napolitano*, Suffolk, ss, Nos.

09884–09885, slip op. at 4 (October 30, 1997); *Commonwealth v. Rosario*, Middlesex, ss, Nos. 82–2399 through 82–2407, slip op. at 15 (May 3, 1996); *Commonwealth v. Rodriguez*, Worcester, ss, No. 71–45713, slip op. at 4 (April 18, 1996); and *Commonwealth v. Carrodino*, Suffolk, ss, No. 77934, slip op. at 2 (April 12, 1995).

5. The judge in that case was the same as in the present case.

175, 178–79 (4th Cir.1994); *Nutter v. White*, 39 F.3d 1154, 1157–58 (11th Cir.1994); and, *In re Smith*, 142 F.3d 832, 835 (5th Cir. 1998).[6]

Of course, a new rule is only helpful to Simpson if it is to be applied retroactively. But that is the case both for new federal and new Massachusetts law on reasonable doubt instructions.

Starting with federal law, the Commonwealth argues that only law that was already "clearly established" at the time of the trial can be applied on habeas review. They claim that § 2254(d) codifies the prohibition of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), against applying, on collateral review, "new constitutional commands." But *Teague* made two exceptions to that general rule:

> First, a new rule should be applied retroactively if it places certain primary, private individual conduct beyond the power of the criminal law-making authority to proscribe. Second, a new rule should be applied retroactively if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty.

489 U.S. at 307, 109 S.Ct. 1060 (internal citations and quotation marks omitted).

A number of circuits have held that errors on reasonable doubt instructions, so called *"Cage–Victor"* errors, fall under the second *Teague* prong. They look to the Court's decision in *Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), which held that "a beyond a reasonable doubt factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof." 508 U.S. at 281, 113 S.Ct. 2078 (internal quota-

tion marks omitted). The *Sullivan* Court also held that such an error was a "structural defect[ ]" which "def[ies] analysis by 'harmless-error' standards." *Id.* The cases that hold that *"Cage–Victor"* errors are retroactive include: *In re Smith*, 142 F.3d at 835 (citing *Humphrey, III v. Cain*, 138 F.3d 552 (5th Cir.1998)); *Adams*, 41 F.3d at 179; and *Nutter*, 39 F.3d at 1157–58. I adopt their reasoning here.[7]

The foregoing analysis applies seamlessly to the question of the retroactivity of new reasonable doubt law in Massachusetts. First, Massachusetts has adopted the *Teague* standard for retroactivity. *See Commonwealth v. Sullivan*, 425 Mass. 449, 454, 681 N.E.2d 1184 (1997). Second, as already noted, Massachusetts has looked to evolving federal standards on reasonable doubt instructions for its own evolving standard. *See Gagliardi*, 418 Mass. at 568, 638 N.E.2d 20 (citing to both *Sullivan* and *Victor*). *See also Commonwealth v. Bonds*, 424 Mass. 698, 702, 677 N.E.2d 1131 (1997) (citing *Victor* and *Cage*). Third, in *Bonds*, a case with instructions and temporal delay (24 years) very similar to this one, the SJC explicitly held that new law on reasonable doubt instructions had to apply retroactively. While one ground in *Bonds* for doing so was that the defendant had never appealed his conviction before, the other ground was that "the doctrine of waiver, is . . . unavailable because the law regarding the use of moral certainty and examples from everyday life was not sufficiently developed at the time of the defendant's trial." 424 Mass. at 700, 677 N.E.2d 1131. The *Bonds* Court also held that: "The benefit of this new law is of particular importance in this case where it is

6. Justice Herbert Travers, Jr., in denying Simpson's sixth motion for a new trial, acknowledged that changes in the law regarding reasonable doubt instructions since Simpson's trial made it the kind of claim which he could raise on a motion for a new trial. *Commonwealth v. Simpson*, Worcester, ss, No. 64851–3, slip op. at 010 (October 17, 1994).

7. The AEDPA requires the Supreme Court itself to make a rule retroactive for a second or successive habeas petition. "A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless (A)

the applicant shows that the claim relies on a new rule of constitutional law, *made retroactive to cases on collateral review by the Supreme Court,* that was previously unavailable." § 2244(b)(2) (emphasis added). But it would be a completely unnatural reading of the statute to hold that the Supreme Court has to make a rule retroactive for first petitions as well. *See In re Smith*, 142 F.3d at 836 (holding that a circuit court could decide that a new rule on jury instructions applies retroactively for first habeas petitions, but not for successive ones). The First Circuit has not yet ruled directly on the question.

clear that the instructions on reasonable doubt would have been upheld had the appeal taken place at an earlier date." *Id.* at 700–01, 677 N.E.2d 1131.[8]

### B. *Review on the Merits*

#### 1. *The Reasonable Doubt Standard*

■ AEDPA § 2254(d)(1) provides that a writ of habeas corpus may not be granted unless the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Federal law on the burden of proof in a criminal trial requires that the government prove each element of a crime beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 361–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

■ There is no constitutional requirement that the trial court provide the jury with any particular definition of "reasonable doubt." [9] *Lanigan v. Maloney*, 853 F.2d 40, 48 (1st Cir.1988). Indeed, the words "reasonable doubt" are said to "elude[ ] clear definition." *United States v. Olmstead*, 832 F.2d 642, 645 (1st Cir.1987). The standard is, therefore, that "taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (internal square brackets omitted). When testing to see if the standard was met, "the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it." *Id.* at 6, 114 S.Ct. 1239.

■ As noted above, the federal standard for reasonable doubt instructions changed in 1990 in *Cage*, and should be held to apply retroactively. Of course, federal courts do not exercise supervisory power over the state courts. *See Victor*, 511 U.S. at 17, 114 S.Ct. 1239. But "[w]here a trial court has seriously misdescribed the government's burden of proof ... there has been no jury verdict within the meaning of the Sixth Amendment." *United States v. Colon–Pagan*, 1 F.3d 80, 82 (1993) (quoting *Sullivan*, 508 U.S. at 280, 113 S.Ct. 2078) (internal quotation marks omitted).

#### 2. *Particular Problematic Instructions*

■ The instructions on reasonable doubt in this case are unusually short and problematic. Insofar as the judge defined the concept of reasonable doubt at all, he did so in the space of two remarkably unhelpful and misleading sentences:

[6][b] [Y]ou must be sure to a moral certainty, [c] to that same degree of certainty which you would want when you have had to make decisions of importance in your own lives. [7] After you have discussed the evidence thoroughly amongst yourselves, [d] if you have any serious unanswered questions about the defendant's guilt, then he must be given the benefit of the doubt.

The problematic words here are "moral certainty," "decisions of importance," and benefit of the doubt if you have "serious unanswered questions." They must be examined both individually and as a group.

#### a. *Moral Certainty, [6][b]*

An early and influential definition declared that reasonable doubt was doubt "which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." *Commonwealth v. Webster*, 59 Mass. 295, 320 (1850) *quoted in Victor*, 511 U.S. at 8, 114 S.Ct.

---

8. The discussion below, especially with regard to *Bumpus v. Gunter*, 635 F.2d 907 (1st Cir.1980), makes clear that this condition applies in the present case as well.

9. Indeed, some authorities disfavor attempts to define "reasonable doubt" at all on the ground that such elaborations are at best unhelpful and at worst impermissibly lessen the government's burden. *See Victor v. Nebraska*, 511 U.S. 1, 114

S.Ct. 1239, 1252, 127 L.Ed.2d 583, n. *(1994) (Ginsburg, J., concurring in part and concurring in the judgment)*citing U.S. v. Adkins*, 937 F.2d 947, 950 (4th Cir.1991) and *U.S. v. Hall*, 854 F.2d 1036, 1039 (7th Cir.1988); *see also U.S. v. Campbell*, 874 F.2d 838, 843 (1st Cir.1989) ("the words 'reasonable doubt' need no defining or refining").

1239. "Moral certainty" was apparently understood at the time *Webster* was written to indicate "a state of subjective certitude" concerning the matter at hand. *Victor,* 511 U.S. at 11, 114 S.Ct. 1239. A subsequent Massachusetts decision added that proof to a moral certainty was proof "as satisfies the judgment and consciences of the jury, as reasonable men, and applying their reason to the evidence before them, that the crime charged has been committed by the defendant, and so satisfies them as to leave no other reasonable conclusion possible." *Commonwealth v. Costley,* 118 Mass. 1, 24 (1875) *quoted in Victor,* 511 U.S. at 12, 114 S.Ct. 1239.

The phrase "moral certainty" has, however, fallen into disfavor. The Court in *Victor* held that "moral certainty" "has lost its historic meaning," and that "standing alone it might not be recognized by modern jurors as a synonym for 'proof beyond a reasonable doubt.'" 511 U.S. at 13–14, 114 S.Ct. 1239. Modern jurors "might understand the phrase to mean something less than the very high level of probability required by the Constitution in criminal cases." *Id.* at 14, 114 S.Ct. 1239.

### b. *Decisions of Importance, [6][c]*

Another formulation which has "drawn criticism for decades" is the comparison of "beyond a reasonable doubt" to the "degree of satisfaction of mind and conscience that jurors should have when they take action in the major affairs of their lives." *Gilday v. Callahan,* 59 F.3d 257, 264 (1st Cir.1995), *citing United States v. Drake,* 673 F.2d 15, 20 (1st Cir.1982) and *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). One reason courts have found this formulation objectionable is that people are often required to act in the major affairs of their lives even when they are not entirely confident of the correctness of the result. *See Bumpus v. Gunter,* 635 F.2d 907, 913 (1st Cir.1980): "[E]ither one of two possible choices [could be] fraught with risk and

therefore neither choice could be made with anything approaching moral certainty." [10] Indeed, "decisions we make in the most important affairs of our lives—choosing a spouse, a job, a place to live, and the like—generally involve a very heavy element of uncertainty and risk-taking." *Victor,* 511 U.S. at 24, 114 S.Ct. 1239 (Ginsburg, J. concurring), *citing* Federal Judicial Center, Pattern Criminal Jury Instructions 18–19 (1987) (commentary on instruction 21). Such risk taking would be clearly inappropriate in the context of deciding whether a person is guilty beyond a reasonable doubt.

### c. *Serious Unanswered Questions, [7][d]*

The appeal to "serious unanswered questions," is also dangerously misleading. Though it could be read, as the Commonwealth suggests, to indicate that the jury should not acquit if they have trivial or whimsical questions, it could also be read to indicate that the jury should acquit only if they have "grave" questions.[11] *The American Heritage Dictionary* (Second College Edition, 1985), at 1120, lists as its first definition of "serious": "Grave in character, quality, or manner." If the jury interpreted the instruction that way, then it would fall directly into the problematic category described by *Cage:* "It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard." 498 U.S. at 41, 111 S.Ct. 328.

### d. *Compounded Problems*

The problem of compounded confusion, when one misleading instruction is piled on top of another, was addressed recently in by the First Circuit in *Gilday:*

> As we have discussed, none of the multiple deficiencies in the second portion of the charge was of sufficient magnitude to weaken the conviction. Taken together, however, their effect is more substantial.

---

10. There are cases that treat the problem with "significant life decisions" language as being simply that it might trivialize the decision. Oddly, *Bumpus,* 635 F.2d at 913, goes on to treat it that way, overlooking the logical problem that it is easy to conceive of very serious decisions, which have to be made, and which are made on

a most uncertain basis. *See also Dunn v. Perrin,* 570 F.2d 21, 24 (1st Cir.1978).

11. A nearly identical point was made in *Victor,* 511 U.S. at 19, 114 S.Ct. 1239, concerning the ambiguity in the word "substantial."

Reasonable doubt is defined with the imperfect term "moral certainty," and one alternative explanation of moral certainty is the disfavored formulation concerning personal decisionmaking. Yet another description of reasonable doubt and moral certainty suggests that the jury's task is simply a matter of weighing the pros and cons to reach a decision that "may be right" or "might be wrong." . . . If these . . . sections comprised the entire instruction, we might well conclude that reversal would be necessary.

59 F.3d at 265.

### e. Redeeming Language

The Commonwealth points out that each of these problems, even taken together, has been found not to be so bad as to require reversal. Indeed, the Court in *Gilday* did not find that reversal was necessary. What saved the jury instructions in *Gilday*, was that "at the conclusion of the portions of the charge we have quoted so far, the judge essentially began anew." *Id.* In other words, it was the fact that at some point the judge instructed the jury correctly that saved his instructions. Similar saving instructions were given in *Victor*, 511 U.S. at 14, 114 S.Ct. 1239 (the concept of moral certainty was linked with that of an "abiding conviction"), and at 19–20 (substantial doubt was contrasted with "a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture"). Likewise, "serious unanswered questions" language was held, "when viewed in light of the entire charge," not to affect the degree of doubt required to convict in *Grace v. Butterworth*, 635 F.2d 1, 7 (1st Cir.1980).

But this case is strikingly like *Cage* in that there is nothing redeeming about the charge. In *Cage* the definition of reasonable doubt was, as in the present case, very short, and was given solely in problematic terms, namely "substantial doubt," "grave uncertainty" and "moral certainty." The first two misstated the standard, and the last only added to the confusion. Likewise here, the problematic concept of moral certainty was introduced, and then the problem was compounded by the introduction of two other problematic concepts as the only other guideposts.[12]

The Commonwealth argues that, despite the brief and problematic definition of reasonable doubt in this case, there was sufficient saving language. The jurors were repeatedly told that they must rest their decision exclusively upon the admissible evidence—all of it; that the defendant is presumed innocent; that the Commonwealth bears the burden of proving his guilt; and, that his guilt had to be proved beyond a reasonable doubt. The jurors were also told that their verdict had to be unanimous, that their decision had finality and therefore was to be taken seriously, and that they had to "be sure" of their conclusion. The problem is that, with the exception of being told that they had to "be sure" (sentence [2][a] ), these instructions were all solutions to different problems. The problem is not that the jurors might have used outside knowledge specific to the case, ignored some of the evidence, presumed the defendant was guilty unless he proved otherwise, or failed to apply what they took to be the reasonable doubt standard. The problem is that the jurors might have had in mind the wrong standard of proof entirely. The only helpful thing the judge said on that point was that the jurors had to be "sure." But just how sure is exactly what the instructions on reasonable doubt were supposed to clarify. The instructions on that score were not

---

**12.** Contrast my opinion in *Moore v. Ponte*, U.S.D.C. No. 91–10483–NG, slip op.(January 23, 1998) (*Moore II* ). The errors in *Moore II* were in some ways more egregious than the errors in the present case. But the trial judge in *Moore II* inserted sufficient saving language, instructing the jurors that they may only convict on the basis of a "clear and settled conviction of guilt," and equating reasonable doubt with "doubt as remains in the mind of a reasonable man or woman who is earnestly seeking the truth." Writing on a clean slate, I would have found the overall effect gave rise to a reasonable likelihood that the jury applied the trial court's reasonable doubt instruction in an unconstitutional manner. But given the standard set by *Bumpus* and *Gilday*, I acknowledged that I had to deny the petitioner's request for the writ. Simpson's case, completely lacking these redeeming phrases, goes over the line.

merely unhelpful; they were misleading, quite possibly seriously misleading.

Honesty requires acknowledging that the Court in *Bumpus* relied on the kind of list the Commonwealth relies on here to cure equally egregious instructions. *Bumpus* repeatedly referred to the length of the charge, and found significance in the fact that the jury was repeatedly advised that the government had to prove the defendant's guilt beyond a reasonable doubt, was admonished to render an impartial verdict, and was informed throughout of the solemnity of its responsibility. Nowhere did the *Bumpus* Court find a directly clarifying statement of the reasonable doubt standard, and yet the Court refused to grant habeas relief.

*Bumpus*, however, has to be put in its historic context.[13] As that Court presciently observed:

> The decade of the 1980's will continue to see a heightened awareness of the dangers lurking in some of the hoary, oft-repeated illustrations used up through the 60's and early 70's to breathe life into the reasonable doubt standard. Such awareness may lead to generally stricter requirements as to what is acceptable and may even result in more helpful charges.

635 F.2d at 913. Indeed, the end of the 1980's brought *Cage* and what are acknowledged as new, more rigorous standards for jury instructions. While Simpson's instructions might have been held acceptable in 1980, they are to be judged under the current law, retroactively applied, not under what once seemed to be the correct law.[14] Under this new regime, Simpson's jury instructions do not pass constitutional muster.

## III. *CONCLUSION*

When there is a reasonable likelihood that the jury misapplied the reasonable doubt standard, then the trial is infected with a structural defect "which vitiates all the jury's findings." *Sullivan*, 508 U.S. at 281, 113 S.Ct. 2078. *See also Moore*, 924 F.Supp. at 1298. Because the concept of a reasonable doubt was defined only by reference to three dubious concepts, with no correct statement to rectify those errors, I find that there was a reasonable likelihood that the jury misapplied the reasonable doubt standard.

Accordingly, Simpson's motion for habeas corpus [# 1] is **GRANTED.**

**SO ORDERED.**

---

13. I did not go through this criticism of *Bumpus* in *Moore II* because it was clear that there were sufficient saving factors to pass even the more rigorous *Cage–Victor* standard.

14. For a parallel, see again the comment in *Bonds*, 424 Mass. at 700–01, 677 N.E.2d 1131: "The benefit of this new law is of particular importance in this case where it is clear that the instructions on reasonable doubt would have

been upheld had the appeal taken place at an earlier date."